IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | |
|---|---|
| **WOLFSPEED, INC.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**NAVITAS SEMICONDUCTOR CORPORATION, and GENESIC SEMICONDUCTOR LLC,**<br><br>**Defendant.** | Case No. _____ |

## COMPLAINT

## (JURY TRIAL DEMANDED)

Plaintiff Wolfspeed, Inc. ("Wolfspeed"), complaining of defendants Navitas Semiconductor Corporation and GeneSiC Semiconductor LLC (together, "Defendants" or "Navitas"), alleges and says:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Wolfspeed, Inc. is a North Carolina corporation with its principal place of business in Durham, Durham County, North Carolina.

2. Defendant Navitas Semiconductor Corporation is a Delaware corporation with its principal place of business in Torrance, Los Angeles County, California.

3. Defendant GeneSiC Semiconductor LLC is a Delaware limited liability company with its principal place of business in Torrance, Los Angeles County, California. To the best of Plaintiff's knowledge, none of GeneSiC Semiconductor LLC's are citizens of North Carolina.

4. There is complete diversity of citizenship between all plaintiffs and all defendants.

5. The amount in controversy is in excess of $75,000.00.

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

7. Venue is proper in the Durham division of the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this matter occurred in Durham. Specifically, Wolfspeed resides and conducts its business in Durham; the claims relate to the breach of a contract for goods manufactured in and shipped from Durham; and Navitas knowingly directed its relevant conduct and communications towards Durham, or the relevant conduct and communications took place in Durham.

8. This Court has personal jurisdiction over Navitas because Navitas purposefully availed itself of the privilege of conducting activities in North Carolina, and Wolfspeed's claims against Navitas arise out of those activities. Additionally, upon information and belief, Navitas also has systematic and continuous ongoing contacts with North Carolina unrelated to its dealings with Wolfspeed, including but not limited to conducting business with other suppliers in North Carolina, and traveling to North Carolina for business purposes.

## BACKGROUND FACTS

9. This dispute arises from Navitas' breach of an installment agreement for the sale of goods, memorialized as Offer and Agreement for Sale of Products Number 00022308, dated August 4, 2023 (the "Agreement"). A copy of the Agreement is attached as **Exhibit 1**.

10. Navitas repudiated its obligations under and materially breached the Agreement by, among other things, failing to purchase the agreed-upon quantity of goods from Wolfspeed.

**Navitas and Wolfspeed Entered an Agreement for the Sale of Goods.**

11. Wolfspeed manufactures and sells semiconductors including bare wafers. A semiconductor is a solid substance that has electrical conductivity. A bare wafer is a thin slice of

semiconducting material that serves as the substrate (or surface) for microelectronic devices built in and upon it. Defendants develop and manufacture microelectronic devices using bare wafers.

12. On August 1, 2023, Navitas agreed to purchase, and Wolfspeed agreed to sell, 5,000 bare wafers in scheduled installments over a six-month period in Q4CY23 and Q1CY24 at the price of $855.00 per unit of wafer, for a total purchase price of $4,272,000.00.

13. On August 3, 2023, Wolfspeed memorialized the terms of this agreement in an email to Navitas.

14. In response, on August 4, 2023, Navitas issued a purchase order to Wolfspeed for 5,000 bare wafers priced at $855.00 per unit. A copy of this purchase order is attached as **Exhibit 2**.

15. Wolfspeed responded to Navitas's purchase order with an email containing the Agreement in which Wolfspeed offered 5,000 bare wafers priced at $855.00 per unit to Navitas. A copy of the August 4, 2023 email exchange is attached as **Exhibit 3**.

16. The Agreement incorporates Wolfspeed's standard Terms and Conditions, a copy of which is attached as **Exhibit 4.**

17. The Agreement provided for Wolfspeed's delivery of 4,000 wafers to Navitas by the end of December 2023, and the remaining 1,000 wafers by the end of January 2024.

18. On December 5, 2023, at Navitas's request, Wolfspeed agreed to reschedule the delivery of 1,000 of these ordered wafers from Q4CY23 to Q1CY24, although Wolfspeed was under no obligation to do so.

19. The revised delivery terms required Wolfspeed's final delivery by the end of March 2024.

**Wolfspeed Fully Performed Its Obligations Under the Agreement; Navitas Did Not.**

20. Pursuant to the terms of the Agreement, Wolfspeed manufactured and shipped, and Navitas accepted and paid for 2,975 wafers in Q4CY23.

21. Wolfspeed expected Navitas would continue to perform its obligations under the Agreement with respect to the remaining 2,025 units, which Navitas had committed to purchase by March 2024.

22. By February 2024, Wolfspeed had delivered another 625 wafers to Navitas, and was manufacturing wafers to fulfill the remainder of Navitas' order per the agreed delivery schedule.

23. On February 8, 2024, Navitas suddenly halted all further shipments of the wafers that it ordered under the Agreement, and threatened to cancel the wafers that were not yet delivered.

24. Navitas's halting of further shipments was not authorized or permitted by the Agreement.

25. Wolfspeed declined to stop further shipments because the remainder of the wafers which Navitas had committed to purchase was in process and allocated to Navitas.

26. In response, on February 19, 2024, Navitas demanded that Wolfspeed reduce the price per unit in the Agreement because it allegedly found more favorable pricing in the market.

27. Wolfspeed declined to adjust the Parties' agreed-upon price and confirmed it would adhere to the price contemplated by the Agreement.

28. Wolfspeed fully performed its obligations under the Agreement and delivered the remaining 2,025 units to Navitas in Q1CY24.

29. Without justification or permission, Navitas retained and paid the agreed-upon price of $855.00 for only 50 of the 2,025 units, retained another 925 units without payment, and returned 1,050 units to Wolfspeed, before opening the package and also without payment.

30. In all, Navitas failed to pay Wolfspeed for 1,975 units (the "Unpurchased Units") which Wolfspeed delivered to Navitas in Q1CY24.

**Navitas Failed to Provide Adequate Assurances That It Will Perform Its Outstanding Obligations Under the Agreement.**

31. Under the terms of the Agreement, Navitas owes Wolfspeed $1,688,625.00 for the Unpurchased Units, plus 1.5% interest for amounts not paid when due per the terms of the Agreement providing for interest at a rate of 1.5% per month for past-due amounts.

32. After Navitas's failure to purchase the Unpurchased Units on schedule, Wolfspeed and Navitas engaged in multiple discussions during which Wolfspeed sought a commitment from Navitas that it would honor its contractual obligations to Wolfspeed.

33. Rather than assure Wolfspeed that Navitas would honor its contractual obligations, Navitas attempted in those discussions to convince Wolfspeed to accept its breach of contract and not pursue payment for the Unpurchased Units that Wolfspeed had already delivered to Navitas.

34. At no point during any of those discussions did Navitas confirm to Wolfspeed that Navitas intended to honor its obligations under the Agreement.

35. Wolfspeed had reasonable grounds for insecurity with respect to Navitas's performance under the Agreement because Navitas (i) failed to purchase the required number of units in Q1CY24; (ii) has refused to confirm that it intends to purchase the remaining balance of the Unpurchased Units; and (iii) attempted on numerous occasions to renegotiate the terms of the Agreement, including the pricing to which the Parties agreed.

36. Accordingly, on May 3, 2024, under § 2-609 of the New York Uniform Commercial Code, Wolfspeed demanded that Navitas provide Wolfspeed with adequate assurances that Navitas was able and willing to meet its contractual obligations with respect to the Unpurchased Units.

37. Specifically, Wolfspeed requested that Navitas provide, within 5 business days of the date of Wolfspeed's demand for adequate assurances:

   a. Full payment of $1,718,229.38, which represented the late invoices in the amount of $1,688,625.00 plus interest of $29,604.38 as of the date of the demand, per the terms of the Agreement;

   b. Confirmation that Navitas will accept the goods previously returned and reimburse Wolfspeed for all expenses associated with reshipping them to Navitas; and

   c. Written confirmation that it will abide by the Parties' Agreement and all terms contained therein.

A copy of Wolfspeed's demand for adequate assurances is attached as **Exhibit 5**.

38. The assurances that Wolfspeed requested would have been sufficient to satisfy Wolfspeed's insecurity regarding Navitas's contract performance had Navitas provided them to Wolfspeed.

39. The assurances that Wolfspeed requested are in accordance with generally accepted commercial standards and practice in the semiconductor manufacturing industry.

40. Wolfspeed provided Navitas with 5 business days to provide Wolfspeed with the demanded assurances. Five business days was a reasonable amount of time for Navitas to provide the demanded assurances.

41. Navitas responded to Wolfspeed's adequate assurances demand on May 17, 2024, but did not provide Wolfspeed with any of the assurances that Wolfspeed demanded. A copy of Navitas's May 17, 2024 correspondence to Wolfspeed is attached as **Exhibit 6**.

42. Navitas has failed and refused to honor the terms of the Agreement. Specifically, Navitas has failed and refused to pay the agreed price for some wafers it retained, and has threatened to return other wafers in violation of the Agreement and Wolfspeed's Terms and Conditions.

43. By refusing to provide Wolfspeed with assurances that Navitas could and would perform under the Parties' agreement, Navitas repudiated and materially breached the Parties' Agreement.

44. Wolfspeed has fully performed its obligations under the Agreement.

45. Wolfspeed is not able to sell the Unpurchased Units at the same price set forth in the Agreement.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

46. Wolfspeed realleges and incorporates by reference the allegations of all of the foregoing paragraphs of the Complaint.

47. The Agreement concerns the sale of goods and is governed by Article 2 of the Uniform Commercial Code.

48. In the alternative, the email exchanges between the parties formed an enforceable contract with a price and quantity term under Article 2 of the Uniform Commercial Code (the "UCC Contract").

49. The Agreement, or in the alternative the UCC Contract, is valid and supported by adequate consideration.

50. Wolfspeed fully performed its obligations under the parties' agreement, whether formed in the Agreement or under the UCC.

51. The wafers conformed to Navitas' specifications.

52. Navitas failed to purchase the Unpurchased Units from Wolfspeed for $855.00 per unit as contemplated by the parties' agreement.

53. Wolfspeed had reasonable grounds for insecurity regarding Navitas's performance of its remaining obligations under the parties' Agreement.

54. Wolfspeed provided Navitas with proper written notice of Wolfspeed's reasonable grounds for insecurity in its demand for adequate assurances.

55. The assurances that Wolfspeed requested were both subjectively acceptable to Wolfspeed and commercially reasonable.

56. Wolfspeed provided Navitas with a reasonable time to comply with Wolfspeed's demand for adequate assurances.

57. Navitas repudiated and materially breached the parties' Agreement by failing to provide Wolfspeed with the assurances Wolfspeed demanded.

58. As a result of Navitas's breaches, Wolfspeed has suffered damages of not less than $1,688,625.00.

WHEREFORE, Wolfspeed respectfully requests the following relief:

A. An award of compensatory damages in an amount to be proven at trial but not less than $1,688,625.00;

B. The full measure of direct, indirect, consequential, incidental, and special damages to which Wolfspeed is entitled under all applicable law, the New York Uniform Commercial Code, and the Agreement;

C. Wolfspeed's reasonable attorneys' fees and expenses; and

D. Any other and further relief that the Court deems just and proper.

This the 11th day of December, 2024.

*/s/ Rebecca K. Lindahl*

Rebecca K. Lindahl (N.C. Bar No. 35378)
**KATTEN MUCHIN ROSENMAN LLP**
550 S. Tryon Street, Suite 2900
Charlotte, NC 28202-4123
(704) 344-3141
rebecca.lindahl@katten.com

Asena Baran (*pro hac vice forthcoming*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
(310) 788-4418
asena.baran@katten.com

*Attorneys for Plaintiff, Wolfspeed, Inc.*