| | |
|---|---|
| **WOLFSPEED, INC.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**NAVITAS SEMICONDUCTOR CORPORATION, GENESIC SEMICONDUCTOR LLC, PAUL WHEELER, and SASCHA DERN,**<br><br>**Defendant.** | Case No.  1:24-cv-01038 |

## SECOND AMENDED COMPLAINT
## (JURY TRIAL DEMANDED)

Plaintiff Wolfspeed, Inc. ("Wolfspeed"), complaining of defendants Navitas Semiconductor Corporation and GeneSiC Semiconductor LLC (together, "Navitas"), Paul Wheeler ("Mr. Wheeler"), Sascha Dern ("Mr. Dern"), and together with "Navitas" and "Mr, Wheeler," "Defendants"), alleges and says:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Wolfspeed, Inc. is a Delaware corporation with its principal place of business in Durham, Durham County, North Carolina.

2. Defendant Navitas Semiconductor Corporation is a Delaware corporation with its principal place of business in Torrance, Los Angeles County, California.

3. Defendant GeneSiC Semiconductor LLC is a Delaware limited liability company with its principal place of business in Torrance, Los Angeles County, California.

1

To the best of Plaintiff's knowledge, none of GeneSiC Semiconductor LLC's members are citizens of Delaware.

4. Upon information and belief, Defendant Paul Wheeler is a citizen and resident of Melissa, Texas.

5. Upon information and belief, Defendant Sascha Dern is a citizen and resident of Starnberg, Bayern, Germany who also maintains a physical and legal residence in California.

6. There is complete diversity of citizenship between all plaintiffs and all defendants.

7. The amount in controversy is in excess of $75,000.00.

8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

9. Venue is proper in the Durham division of the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this matter occurred in Durham. Specifically, Wolfspeed's headquarters resides, and Wolfspeed conducts its business, in Durham; the claims relate to the breaches of contracts for goods and employment executed in Durham; and Navitas knowingly directed its relevant conduct and communications towards Durham, or the relevant conduct and communications took place in Durham.

10. This Court has personal jurisdiction over Navitas because Navitas purposefully availed itself of the privilege of conducting activities in North Carolina, and Wolfspeed's claims against Navitas arise out of those activities. Additionally, upon

2

information and belief, Navitas also has systematic and continuous ongoing contacts with North Carolina unrelated to its dealings with Wolfspeed, including but not limited to conducting business with other suppliers in North Carolina, and traveling to North Carolina for business purposes.

11. The Court has personal jurisdiction over Mr. Wheeler and Mr. Dern because Mr. Wheeler and Mr. Dern are former employees of Wolfspeed and purposefully availed themselves of conducting activities in North Carolina, and part of Wolfspeed's claims against Navitas arise out of those activities. Additionally, upon information and belief, Mr. Wheeler and Mr. Dern also have systematic and continuous ongoing contacts with North Carolina related to their dealings with Wolfspeed, including but not limited to soliciting Wolfspeed's customers and employees who are residents of North Carolina.

### BACKGROUND FACTS

12. This dispute arises from Navitas's breach of an installment agreement for the sale of goods, memorialized as Offer and Agreement for Sale of Products Number 00022308, dated August 4, 2023 (the "Agreement"). A copy of the Agreement is attached as **Exhibit 1**.

13. Navitas repudiated its obligations under and materially breached the Agreement by, among other things, failing to purchase the agreed-upon quantity of goods from Wolfspeed.

14. As the relationship between Wolfspeed and Navitas deteriorated during the dispute over Navitas's failure to make payment under the Agreement, Navitas began

3

poaching Wolfspeed's employees, including Mr. Wheeler, and soliciting Wolfspeed's customers.

**Navitas and Wolfspeed Entered an Agreement for the Sale of Goods.**

15. Wolfspeed manufactures and sells semiconductors including bare wafers. A semiconductor is a solid substance that has electrical conductivity. A bare wafer is a thin slice of semiconducting material that serves as the substrate (or surface) for microelectronic devices built in and upon it. Defendants develop and manufacture microelectronic devices using bare wafers.

16. On August 1, 2023, Navitas agreed to purchase, and Wolfspeed agreed to sell, 5,000 bare wafers in scheduled installments over a six-month period in Q4CY23 and Q1CY24 at the price of $855.00 per unit of wafer, for a total purchase price of $4,272,000.00.

17. On August 3, 2023, Wolfspeed memorialized the terms of this agreement in an email to Navitas.

18. In response, on August 4, 2023, Navitas issued a purchase order to Wolfspeed for 5,000 bare wafers priced at $855.00 per unit. A copy of this purchase order is attached as **Exhibit 2**.

19. Wolfspeed responded to Navitas's purchase order with an email containing the Agreement in which Wolfspeed offered 5,000 bare wafers priced at $855.00 per unit to Navitas. A copy of the August 4, 2023 email exchange is attached as **Exhibit 3**.

20. The Agreement incorporates Wolfspeed's standard Terms and Conditions, a copy of which is attached as **Exhibit 4.**

4

21. The Agreement provided for Wolfspeed's delivery of 4,000 wafers to Navitas by the end of December 2023, and the remaining 1,000 wafers by the end of January 2024.

22. On December 5, 2023, at Navitas's request, Wolfspeed agreed to reschedule the delivery of 1,000 of these ordered wafers from Q4CY23 to Q1CY24, although Wolfspeed was under no obligation to do so.

23. The revised delivery terms required Wolfspeed's final delivery by the end of March 2024.

**Wolfspeed Fully Performed Its Obligations Under the Agreement; Navitas Did Not.**

24. Pursuant to the terms of the Agreement, Wolfspeed manufactured and shipped, and Navitas accepted, received, and paid for, 2,975 wafers in Q4CY23.

25. Wolfspeed expected Navitas would continue to perform its obligations under the Agreement with respect to the remaining 2,025 units, which Navitas had committed to purchase by March 2024.

26. By February 2024, Wolfspeed had delivered another 625 wafers to Navitas, and was manufacturing wafers to fulfill the remainder of Navitas's order per the agreed delivery schedule.

27. On February 8, 2024, Navitas suddenly halted all further shipments of the wafers that it ordered under the Agreement and threatened to cancel the wafers that were not yet delivered.

28. Navitas's halting of further shipments was not authorized or permitted by the Agreement.

5

29.    Wolfspeed declined to stop further shipments because the remainder of the wafers which Navitas had committed to purchase was in process and allocated to Navitas.

30.    In response, on February 19, 2024, Navitas demanded that Wolfspeed reduce the price per unit in the Agreement because it allegedly found more favorable pricing in the market.

31.    Wolfspeed declined to adjust the Parties' agreed-upon price and confirmed it would adhere to the price contemplated by the Agreement.

32.    Wolfspeed fully performed its obligations under the Agreement and delivered the remaining 2,025 units to Navitas in Q1CY24.

33.    Without justification or permission, Navitas retained and paid the agreed-upon price of $855.00 for only 50 of the 2,025 units, retained another 925 units without payment, and returned 1,050 units to Wolfspeed, before opening the package and also without payment.

34.    In all, Navitas failed to pay Wolfspeed for 1,975 units (the "Unpurchased Units") which Wolfspeed delivered to Navitas in Q1CY24.

### Navitas Failed to Provide Adequate Assurances that It Will Perform Its Outstanding Obligations Under the Agreement.

35.    Under the terms of the Agreement, Navitas owes Wolfspeed $1,688,625.00 for the Unpurchased Units, plus 1.5% interest for amounts not paid when due per the terms of the Agreement providing for interest at a rate of 1.5% per month for past-due amounts.

6

36. After Navitas's failure to purchase the Unpurchased Units on schedule, Wolfspeed and Navitas engaged in multiple discussions during which Wolfspeed sought a commitment from Navitas that it would honor its contractual obligations to Wolfspeed.

37. Rather than assure Wolfspeed that Navitas would honor its contractual obligations, Navitas attempted in those discussions to convince Wolfspeed to accept its breach of contract and not pursue payment for the Unpurchased Units that Wolfspeed had already delivered to Navitas.

38. At no point during any of those discussions did Navitas confirm to Wolfspeed that Navitas intended to honor its obligations under the Agreement.

39. Wolfspeed had reasonable grounds for insecurity with respect to Navitas's performance under the Agreement because Navitas (i) failed to purchase the required number of units in Q1CY24; (ii) has refused to confirm that it intends to purchase the remaining balance of the Unpurchased Units; and (iii) attempted on numerous occasions to renegotiate the terms of the Agreement, including the pricing to which the Parties agreed.

40. Accordingly, on May 3, 2024, under § 2-609 of the New York Uniform Commercial Code, Wolfspeed demanded that Navitas provide Wolfspeed with adequate assurances that Navitas was able and willing to meet its contractual obligations with respect to the Unpurchased Units.

41. Specifically, Wolfspeed requested that Navitas provide, within five (5) business days of the date of Wolfspeed's demand for adequate assurances:

7

a. Full payment of $1,718,229.38, which represented the late invoices in the amount of $1,688,625.00 plus interest of $29,604.38 as of the date of the demand, per the terms of the Agreement;

b. Confirmation that Navitas will accept the goods previously returned and reimburse Wolfspeed for all expenses associated with shipping them to Navitas; and

c. Written confirmation that it will abide by the Parties' Agreement and all terms contained therein.

A copy of Wolfspeed's demand for adequate assurances is attached as **Exhibit 5**.

42. The assurances that Wolfspeed requested would have been sufficient to satisfy Wolfspeed's insecurity regarding Navitas's contract performance had Navitas provided them to Wolfspeed.

43. The assurances that Wolfspeed requested are in accordance with generally accepted commercial standards and practice in the semiconductor manufacturing industry.

44. Wolfspeed provided Navitas with five (5) business days to provide Wolfspeed with the demanded assurances. Five (5) business days was a reasonable amount of time for Navitas to provide the demanded assurances.

45. Navitas responded to Wolfspeed's adequate assurances demand on May 17, 2024, but did not provide Wolfspeed with any of the assurances that Wolfspeed demanded. A copy of Navitas's May 17, 2024 correspondence to Wolfspeed is attached as **Exhibit 6**.

46. Navitas has failed and refused to honor the terms of the Agreement. Specifically, Navitas has failed and refused to pay the agreed price for some wafers it

8

retained, and has threatened to return other wafers in violation of the Agreement and Wolfspeed's Terms and Conditions.

47. By refusing to provide Wolfspeed with assurances that Navitas could and would perform under the Parties' agreement, Navitas repudiated and materially breached the Parties' Agreement.

48. Wolfspeed has fully performed its obligations under the Agreement.

49. Wolfspeed is not able to sell the Unpurchased Units at the same price set forth in the Agreement.

### Grant of Restricted Stock Units to Wheeler and Dern.

50. During their employment, Wolfspeed granted Wheeler and Dern Restricted Stock Units ("RSUs") annually, pursuant to Wolfspeed's Long-Term Incentive Compensation Plan (the "Plan").

51. Wolfspeed memorialized these RSU grants in Restricted Stock Unit Award Agreements ("RSU Agreements").

52. Each RSU Agreement incorporates Terms and Conditions to which Wheeler and Dern agreed and acknowledged by their signature. A True and correct copy of Wheeler's and Dern's Terms and Conditions to Wolfspeed's RSU Agreements is attached as **Exhibit 7**.

53. Section 11 of the RSU Agreements' Terms and Conditions provides that Wolfspeed may "in its sole discretion [] cancel and cause to be forfeited any RSUs not previously vested or released" if Wheeler or Dern engages in "Detrimental Activity."

9

54. "Detrimental Activity" is defined in Section 11(b) of the Terms and Conditions as any activity that breaches the terms of any restrictive covenants in any agreement between Wolfspeed and Wheeler, and Wolfspeed and Dern, including without limitation the Non-Solicitation Agreement, as well as "any attempt to induce an employee to leave employment with [Wolfspeed] to perform services elsewhere, or any attempt to cause a customer or supplier of [Wolfspeed] to curtail or cancel its business with [Wolfspeed]."

55. Section 11 of the RSU Agreements' Terms and Conditions provides that Wolfspeed can in its sole discretion require Wheeler and Dern to pay to Wolfspeed the amount of all gains Wheeler and Dern realized from the vesting of the RSUs beginning six months before his termination, provided that Wolfspeed demands the return of those gains within one year after termination.

**Mr. Wheeler Breached His Employee Agreement with Wolfspeed.**

56. In or around November 2018, Wolfspeed hired Mr. Wheeler as its General Manager of Power Modules.

57. In or around June 2021, Wolfspeed promoted Mr. Wheeler from General Manager to Vice President & General Manager of Power Modules.

58. At the time Wolfspeed hired Mr. Wheeler, and as a condition of his employment with Wolfspeed, he executed an Employee Agreement Regarding Confidential Information, Intellectual Property and Noncompetition (the "Wheeler Employee Agreement"). A copy of the Wheeler Employee Agreement, dated November 5, 2018, is attached as **Exhibit 8**.

10

59. In or around July 2025, Mr. Wheeler accepted a position at Navitas as Navitas's Vice President and General Manager of the SiC [Silicon Carbide] Business Unit.

60. Upon information and belief, Mr. Wheeler's position at Navitas is identical (or nearly identical) to the position that he held at Wolfspeed, and therefore directly competitive with his position that he held at Wolfspeed.

61. Upon information and belief, as the Vice President and General Manager of the SiC [Silicon Carbide] Business Unit of Navitas, he is actively soliciting Wolfspeed's current customers and employees.

62. Wolfspeed is also informed that Mr. Wheeler and others at Navitas have made material misstatements to Wolfspeed's customers about the quality of Wolfspeed's products and Wolfspeed's ability to fulfill orders.

63. Mr. Wheeler's actions in accepting an identical (or nearly identical) role at Navitas as his previous role at Wolfspeed, soliciting Wolfspeed's customers and employees, and disparaging Wolfspeed are direct breaches of several provisions of the Wheeler Employee Agreement in effect for one (1) year post-employment with Wolfspeed, including but not limited to:

- Paragraph 1, which prohibits Mr. Wheeler from revealing any confidential information about Wolfspeed's customer lists, customer or prospective customer needs, contractual terms, marketing plans, or trade secrets; Paragraph 4(d)(i), which prohibits Mr. Wheeler from performing services for any Competing Business, which is defined in Paragraph 4(g), that are the same or similar to the services he performed for Wolfspeed;

11

- Paragraph 4(d)(iii), which prohibits Mr. Wheeler from requesting any of Wolfspeed's customers from curtailing or cancelling their business with Wolfspeed; and

- Paragraph 4(d)(iv), which prohibits Mr. Wheeler from inducing or attempting to terminate their employment with Wolfspeed.

64. Accordingly, on July 29, 2025, Wolfspeed made a letter demand to Navitas requesting that Navitas immediately take steps that Mr. Wheeler is no longer employed in a position that requires him to perform any services for Navitas that are the same or similar to the services Mr. Wheeler performed at Wolfspeed, by August 1, 2025. Wolfspeed further demanded that Navitas immediately instruct Mr. Wheeler to cease and desist all efforts to compete with Wolfspeed in violation of the Wheeler Employee Agreement and to solicit Wolfspeed's customers and employees, by the same date. This demand letter to Navitas is attached as **Exhibit 9**.

65. Wolfspeed also made a letter demand to Mr. Wheeler, by separate letter from Wolfspeed's business unit, requesting that Mr. Wheeler confirm within three (3) days that he has done so, and provide Wolfspeed with (i) a written acknowledgement that he is no longer employed in a same or similar position at Navitas as his previous position at Wolfspeed, accompanied by a complete job description of any alternative position he may have accepted with Navitas; and (ii) a list of each Wolfspeed customer or employee whom he approached to purchase from or work for Navitas. This demand letter to Mr. Wheeler is attached as **Exhibit 10.**

12

66. Both Navitas and Mr. Wheeler did not take corrective action or substantively respond to Wolfspeed's demand letters.

67. On October 9, 2025, Wolfspeed renewed its demands by another letter. This follow-up demand letter is attached as **Exhibit 11.**

68. Navitas also ignored, and did not take corrective action in response to, Wolfspeed's October 9, 2025 demand letter.

### Mr. Dern Breached His Employee Agreement with Wolfspeed.

69. In or around February 2021, Wolfspeed hired Mr. Dern as its Power Modules Product Director for Automotive.

70. In or around June 2023, Wolfspeed promoted Mr. Dern to Director of the Overmolded Power Modules product line.

71. At the time Wolfspeed hired Mr. Dern and as a condition of his employment with Wolfspeed, he executed an Employee Agreement Regarding Confidential Information, Intellectual Property and Noncompetition (the "Dern Employee Agreement"). A copy of the Dern Employee Agreement, dated January 21, 2021, which is comprised of two separate agreements, is attached as **Exhibit 12**.

72. In or around July 2025, Mr. Dern accepted a position at Navitas as Navitas's Vice President of Sales for Europe, the Middle East, and Africa ("EMEA") and India.

73. Upon information and belief, Mr. Dern's position at Navitas is identical (or nearly identical) to the position that he held at Wolfspeed, and therefore directly competitive with his position that he held at Wolfspeed.

13

74. Upon information and belief, as Navitas's VP of Sales for EMEA and India, Mr. Dern is actively soliciting Wolfspeed's current customers and employees.

75. Mr. Dern's actions in accepting an identical (or nearly identical) role at Navitas as his previous role at Wolfspeed and soliciting Wolfspeed's customers and employees are direct breaches of several provisions of the Dern Employee Agreement in effect for one (1) year post-employment with Wolfspeed, including but not limited to:

- Paragraph 1, which prohibits Mr. Dern from revealing any confidential information about Wolfspeed's customer lists, customer or prospective customer needs, contractual terms, marketing plans, or trade secrets; Paragraph 4(d)(i), which prohibits Mr. Dern from performing services for any Competing Business, which is defined in Paragraph 4(g), that are the same or similar to the services he performed for Wolfspeed;

- Paragraph 4(d)(iii), which prohibits Mr. Dern from requesting any of Wolfspeed's customers from curtailing or cancelling their business with Wolfspeed; and

- Paragraph 4(d)(iv), which prohibits Mr. Dern from inducing or attempting to terminate their employment with Wolfspeed.

76. In addition to the Dern Employee Agreement, Dern and Wolfspeed executed a Long-Term International Arrangement ("LTIA") letter on April 17, 2022 that allowed Mr. Dern to perform work for Wolfspeed while living in Germany. To reward Mr. Dern for good performance and attempt to retain him as an employee, Wolfspeed generously agreed to this arrangement following Mr. Dern's request for personal reasons. This

14

agreement was made for Mr. Dern's personal—and not Wolfspeed's business—reasons. A true and correct copy of the LTIA is attached as **Exhibit 13**.

77. Under the LTIA, Mr. Dern was permitted to work in Germany for a minimum of 183 days per calendar year.

78. In the LTIA, Mr. Dern affirmed and agreed that he would "remain bound by the terms of the Wolfspeed Code of Conduct, applicable HR policies, and [the Dern Employee Agreement.]".

79. Wolfspeed terminated Mr. Dern's employment as part of a reduction-in-force on or about July 4, 2025, and on August 7, 2025, Mr. Dern executed an Agreement and General Release (the "Dern Separation Agreement"), under which he accepted a lump sum severance payment of $88,714.34, representing 18 weeks of pay, plus 5 months' COBRA coverage and 3 months' of outplacement services. A true and correct copy of the Dern Separation Agreement is attached as **Exhibit 14**.

80. In Paragraph 3 of the Dern Separation Agreement, Mr. Dern agreed that he was only receiving the consideration of lump-sum pay, COBRA, and outplacement services in exchange for the promises that Mr. Dern made in the Dern Separation Agreement, including fulfilling all of the promises in all other agreements that Mr. Dern previously entered into with Wolfspeed, such as the Dern Employee Agreement and RSU Agreements.

81. Mr. Dern's Employee Agreement and RSU Agreements survived his termination for any reason.

15

82. Mr. Dern further agreed that Wolfspeed may claw back or seek repayment of any amounts granted to or received by Mr. Dern in the event of his breach of any agreement between Mr. Dern and Wolfspeed.

83. In Paragraph 6 of the Dern Separation Agreement, Mr. Dern acknowledged that nothing in the Dern Separation Agreement relieved Mr. Dern from any obligations under his previously executed non-competition or non-solicitation agreements with Wolfspeed.

### Navitas's Continued Solicitation of Wolfspeed Employees.

84. Wolfspeed's allegations against Navitas in the Amended Complaint include a claim for wrongful interference with Wolfspeed's contracts with its employees. There can therefore be no dispute that Navitas is aware of the non-competition and non-solicitation provisions that Wolfspeed enters with its high-level employees and that Wolfspeed takes those obligations seriously.

85. Despite Navitas's awareness of Wolfspeed's practice of executing employment agreements with key employees, Navitas has continued to engage in tortious activity against Wolfspeed and continues to solicit Wolfspeed employees and attempt to entice them to violate their agreements.

86. Ms. Priya Almelkar serves as Wolfspeed's Senior Vice President and Chief Information Officer. Ms. Almelkar began her employment with Wolfspeed in January 2021 and is responsible for overseeing the overall information systems that Wolfspeed utilizes across its organization.

16

87. Ms. Almelkar signed an employment agreement with Wolfspeed that, like the employment agreements of Defendants Dern and Wheeler, contains non-competition covenants. A copy of the Almelkar Employee Agreement is attached hereto as **Exhibit 15**.

88. Ms. Almelkar is a senior employee with important responsibilities, and her loss to a competitor would represent a significant hardship to Wolfspeed with serious ramifications to Wolfspeed's ability to conduct its business.

89. Mr. Sandeep Misra is Wolfspeed's VP, Enterprise Applications, a senior-level IT employee who reports directly to Ms. Almelkar and whom Wolfspeed hired in October 2023.

90. In his role, Mr. Misra oversees a team of project leaders who are responsible for managing system-specific work. Mr. Misra, too, signed an employment agreement with Wolfspeed that contains non-competition covenants. A copy of the Misra Employee Agreement is attached hereto as **Exhibit 16**.

91. Navitas recently attempted to solicit both Ms. Almelkar and Mr. Misra away from Wolfspeed.

92. Specifically, on March 11, 2026, a recruiter working at Navitas's direction reached out to Ms. Almelkar to attempt to induce Ms. Almelkar to terminate her employment with Wolfspeed and to work for Navitas.

93. A separate recruiter working at Navitas's direction made a similar overture to Mr. Misra on April 9, 2026, regarding an opportunity at Navitas which on its face is similar to his current position at Wolfspeed.

17

94. Wolfspeed's legal department became aware of these solicitations the week of April 27, 2026.

95. Despite Navitas's knowledge that Ms. Almelkar and Mr. Misra have employee agreements with Wolfspeed that contain non-competition covenants, and that should any key employee of Wolfspeed accept an offer of employment at Navitas they would be in violation of those covenants, Navitas continues to solicit Wolfspeed employees.

96. Upon information and belief, Navitas will continue to solicit Wolfspeed employees subject to non-competition agreements with Wolfspeed unless enjoined by this Court.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract Against Navitas)

97. Wolfspeed realleges and incorporates by reference the allegations of all of the foregoing paragraphs of the Amended Complaint.

98. The Agreement concerns the sale of goods and is governed by Article 2 of the Uniform Commercial Code.

99. In the alternative, the email exchanges between the parties formed an enforceable contract with a price and quantity term under Article 2 of the Uniform Commercial Code (the "UCC Contract").

100. The Agreement, or in the alternative the UCC Contract, is valid and supported by adequate consideration.

101.   Wolfspeed fully performed its obligations under the parties' Agreement, whether formed in the Agreement or under the UCC.

102.   The wafers conformed to Navitas's specifications.

103.   Navitas failed to purchase the Unpurchased Units from Wolfspeed for $855.00 per unit as contemplated by the parties' Agreement.

104.   Wolfspeed had reasonable grounds for insecurity regarding Navitas's performance of its remaining obligations under the parties' Agreement.

105.   Wolfspeed provided Navitas with proper written notice of Wolfspeed's reasonable grounds for insecurity in its demand for adequate assurances.

106.   The assurances that Wolfspeed requested were both subjectively acceptable to Wolfspeed and commercially reasonable.

107.   Wolfspeed provided Navitas with a reasonable time to comply with Wolfspeed's demand for adequate assurances.

108.   Navitas repudiated and materially breached the parties' Agreement by failing to provide Wolfspeed with the assurances Wolfspeed demanded.

109.   As a result of Navitas's breaches, Wolfspeed has suffered damages of not less than $1,688,625.00.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract Against Mr. Wheeler and Mr. Dern)

110.   Wolfspeed realleges and incorporates by reference the allegations of all of the foregoing paragraphs of the Amended Complaint.

19

111. The non-competition and non-solicitation provisions in the Dern and Wheeler Employee Agreements are enforceable and supported by valid consideration.

112. Wolfspeed has a protectable business interest in prohibiting Mr. Wheeler and Mr. Dern from soliciting its current employees and customers.

113. The non-competition and non-solicitation provisions are no broader than necessary to protect Wolfspeed's protectable business interests.

114. Mr. Wheeler and Mr. Dern breached the Dern and Wheeler Employee Agreements by accepting positions at Navitas that are identical (or nearly identical) to the positions that they held at Wolfspeed.

115. Mr. Wheeler and Mr. Dern breached the Dern and Wheeler Employee Agreements by actively soliciting Wolfspeed's current customers and employees.

116. Mr. Wheeler breached the Wheeler Employee Agreement by making material misstatements to Wolfspeed's customers about the quality of Wolfspeed's products and Wolfspeed's ability to fulfill orders.

117. Specifically, Mr. Wheeler's and Mr. Dern's actions breached Paragraphs 1, 4(d)(iii), and 4(d)(iv) of the Employee Agreement, among others.

118. Upon information and belief, Mr. Wheeler and Mr. Dern continue to solicit Wolfspeed's current customers and employees on behalf of Navitas.

119. By breaching the Dern Employee Agreement, Mr. Dern also breached the Dern Separation Agreement, and Wolfspeed is entitled to claw back all payments to Mr. Dern under the Dern Separation Agreement.

20

120. Wolfspeed has suffered and will continue to suffer both damages and irreparable harm as a result of Mr. Wheeler's and Mr. Dern's breaches of the non-competition and non-solicitation provisions in the Dern and Wheeler Employee Agreements and Dern Separation Agreement.

121. As a result of Mr. Wheeler's and Mr. Dern's breaches, Wolfspeed has suffered damages in an amount to be proven at trial, and is entitled to claw back all amounts paid to Mr. Dern under the Dern Separation Agreement.

<u>**THIRD CLAIM FOR RELIEF**</u>
**(Wrongful Interference with Contractual Relationships Against Navitas)**

122. Wolfspeed realleges and incorporates by reference the allegations of all of the foregoing paragraphs of the Amended Complaint.

123. Upon information and belief, Navitas is aware of the non-competition and non-solicitation provisions in the Dern and Wheeler Employee Agreements and in Wolfspeed's agreements with its other high-level employees, including Ms. Amelkar and Mr. Misra.

124. Navitas, together with Mr. Wheeler and Mr. Dern, has taken efforts to hire Wolfspeed's current employees, including Ms. Amelkar and Mr. Misra, in violation of the terms of the Dern and Wheeler Employee Agreements.

125. Navitas's efforts to hire Wolfspeed's current employees, including Ms. Amelkar and Mr. Misra, have substantially interfered with Wolfspeed's contractual relationships with those employees.

21

126. Navitas, together with Mr. Wheeler and Mr. Dern, have taken efforts to solicit Wolfspeed's customers in violation of the terms of the Dern and Wheeler Employee Agreements.

127. The efforts of Navitas to solicit Wolfspeed's customers have substantially interfered with Wolfspeed's contractual relationships with those customers.

128. Navitas's interference was neither justified nor privileged.

129. As a result of Navitas's unjustified interference, Wolfspeed has suffered damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Breach of RSU Agreements' Terms and Conditions – Wheeler)

130. Wolfspeed realleges the allegations of all prior paragraphs of this Amended Complaint and incorporates them by reference.

131. Mr. Wheeler's actions in accepting a competitive position to Wolfspeed is "Detrimental Activity" as that term is defined in Section 11(b) the RSU Agreements' Terms and Conditions.

132. Mr. Wheeler thus breached the RSU Agreements.

133. By reason of Mr. Wheeler's engagement in Detrimental Activity and breach of the RSU Agreements, Wolfspeed is entitled to require Mr. Wheeler to return all gains that Mr. Wheeler realized from the vesting of the RSUs beginning in the six-month period before his termination.

22

134. Wolfspeed has previously provided and is now providing Mr. Wheeler with notice of Wolfspeed's requirement that he return these gains within one year of his termination.

135. Wolfspeed is entitled to judgment in an amount equal to the gains that Mr. Wheeler realized from the vesting of the RSUs beginning in the six-month period before his termination in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of RSU Agreements' Terms and Conditions – Dern)

136. Wolfspeed realleges the allegations of all prior paragraphs of this Amended Complaint and incorporates them by reference.

137. Mr. Dern's actions in accepting a competitive position to Wolfspeed at Navitas is "Detrimental Activity" as that term is defined in Section 11(b) the RSU Agreements' Terms and Conditions.

138. Mr. Dern thus breached the RSU Agreements.

139. By reason of Mr. Dern's engagement in Detrimental Activity and breach of the RSU Agreements, Wolfspeed is entitled to require Mr. Dern to return all gains that Mr. Dern realized from the vesting of the RSUs beginning in the six-month period before his termination.

140. Wolfspeed has previously provided and is now providing Mr. Dern with notice of Wolfspeed's requirement that he return these gains within one (1) year of his termination.

141. Wolfspeed is entitled to judgment in an amount equal to the gains that Mr. Dern realized from the vesting of the RSUs beginning in the six-month period before his termination in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
#### (Injunctive Relief- Navitas)

142. Wolfspeed realleges the allegations of all prior paragraphs of this Amended Complaint and incorporates them by reference.

143. Navitas's actions in continuing to solicit Wolfspeed employees has caused and will continue to cause irreparable harm to Wolfspeed.

144. Wolfspeed has no adequate remedy at law that will protect Wolfspeed from future irreparable harm and loss arising from the actions of Navitas and those acting in concert with Navitas to cause Wolfspeed employees to breach their non-competition covenants with Wolfspeed unless injunctive relief is granted.

145. Wolfspeed is entitled to an order that Navitas shall cease and desist from contacting Wolfspeed employees.

146. Such immediate relief is reasonably necessary to protect Wolfspeed's legitimate business interests, including the retention of its personnel.

WHEREFORE, Wolfspeed respectfully requests the following relief:

A. An award of compensatory damages in an amount to be proven at trial but not less than $1,688,625.00;

24

B. An order requiring Mr. Wheeler and Mr. Dern to return all of the gains he realized from the vesting of his RSUs beginning in the six-month period before his termination in an amount to be proven at trial;

C. An order requiring Mr. Dern to return all amounts paid to him under the Dern Separation Agreement;

D. The full measure of direct, indirect, consequential, incidental, and special damages to which Wolfspeed is entitled under all applicable law, the New York Uniform Commercial Code, and the Agreement;

E. An order mandating and compelling Navitas to cease and desist immediately from violating the Non-Solicitation Agreements, including without limitation directing Navitas and those acting in concert with Navitas to cease and desist from contacting any and all Wolfspeed employees for purposes of solicitation;

F. Wolfspeed's reasonable attorneys' fees and expenses; and

G. Any other and further relief that the Court deems just and proper.

June 18, 2026.

SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, LLP

/s/ *Hope C. Garber*

Edward F. Roche (N.C. Bar No. 55434)
eroche@smithlaw.com
Hope C. Garber (N.C. Bar No. 59501)
hgarber@smithlaw.com
Post Office Box 2611
Raleigh, NC 27602-2611
Tel.:   (919) 821-1220
Fax:   (919) 821-6800

*Attorneys for Plaintiff Wolfspeed, Inc.*

26

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document with the Clerk of Court using the

CM/ECF System, which will send notification of the filing to all counsel of record.

June 18, 2026.

SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, LLP

/s/ *Hope C. Garber*
Hope C. Garber

27